Joshua P. Davis, Bar No. 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
T. 415.215.0962; F. 215.875.4604

John G. Albanese*
jalbanese@bm.net
Ariana B. Kiener*
akiener@bm.net
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999; F. 612.584.4470

Carl Engstrom*
cengstrom@engstromlee.com
Mark E. Thomson*
mthomson@engstromlee.com
ENGSTROM LEE LLC
729 N Washington Ave., Suite 600
Minneapolis, MN 55401
T. 612.293.8488
*pro hac vice

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Veronica L. Taylor, Deann Fallas, Katharine Bartlett, Vahe Amirian, Phillip I. Cohen, and Maria De Altonaga, individually and as representatives of the Class,<br><br>Plaintiffs,<br><br>vs.<br><br>Midland National Life Insurance Company,<br><br>Defendant. | Case No. 5:23-cv-04125-PCP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

COME NOW, Veronica L. Taylor, Deann Fallas, Katharine Bartlett, Vahe Amirian, Phillip I. Cohen, and Maria De Altonaga ("Plaintiffs"), on behalf of themselves and the Class set forth below, and state as follows:

## INTRODUCTION

1.      This case is brought as a class action on behalf of California public school educators against Defendant Midland National Life Insurance Company ("Defendant" or "Midland") for charging teachers millions of dollars in undisclosed and unauthorized fees on their supplemental retirement savings plans, in violation of Cal. Educ. Code § 25100, *et seq.* (the "Code"), as well as the California Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200, *et seq.* (the "UCL").

2.      California is home to more than 300,000 public school teachers. For most of them, the funds provided by the state's pension system for educators will not be enough to finance their golden years, so the vast majority of teachers supplement their pensions with personal retirement savings plans.

3.      Teachers' personal retirement savings are often invested in retirement plans offered by their school districts pursuant to a provision of the federal tax code, 26 U.S.C. § 403(b), that allows public schools and 501(c)(3) non-profits to offer employees tax advantaged employer-sponsored retirement plans. These plans are commonly referred to as 403(b) plans and offer different investment options, including annuity contracts provided through insurance companies and custodial accounts invested in mutual funds.

4.      The 403(b) market for California teachers has long been rife with abuse, including aggressive sales tactics, hidden (and astronomical) fees, and poor returns on investments.

5.      Lobbied by insurance companies, the California Legislature adopted Section 770.3 of California's Insurance Code, which provides that school districts must remit payroll deductions to whichever provider an employee chooses. *See* Cal. Ins. Code § 770.3. This opened the door for all 403(b) vendors into California schools, where they quickly set up in teachers' lounges with glossy brochures and free baked goods.

6.      For many years, these vendors had no obligation to disclose to educators the full set

of fees associated with their investment products. As a result of insurance companies' aggressive marketing tactics and incomplete disclosures, teachers were often funneled into indexed annuities that came with high fees and low returns while providing huge profits for the insurance companies peddling them.

7.    To correct this injustice, the California Legislature passed the Code, which requires 403(b) vendors to provide certain information about their products on a publicly accessible website, 403bcompare.com ("the Website"), so that teachers can make informed decisions about what investments to hold in their supplemental retirement plans. Indeed, the very URL of the Website underscores its purpose: to allow educators to *compare* their 403(b) options.

8.    Perhaps the biggest change ushered in by the Code was a requirement that 403(b) vendors must fully disclose all "expenses paid directly or indirectly by plan participants." As defined by the statute, the expenses that must be disclosed include all fees, "including, but not limited to…management fees, and annual fees[.]" *See* Cal. Educ. Code § 25101(a)(3). 403(b) vendors are prohibited from charging fees that are not so disclosed. *See* Cal. Educ. Code § 25107.

9.    The Code's emphasis on disclosures is intentional. When insurance companies, mutual fund companies, and broker-dealers fully disclose their fees—both direct and indirect— teachers can meaningfully compare products both when they initially select 403(b) plans, and as they reevaluate their investment strategies (*e.g.*, when they consider replacing an old 403(b) plan with a new one) on an ongoing basis. This transparency allows California's educators to make informed decisions when planning for retirement.

10.   Disclosure of fees also keeps the 403(b) market competitive. When fees are fully disclosed, vendors are incentivized to keep their fees low in order to attract teachers to their plans.

11.   Full disclosures also ensure that mutual fund companies, broker-dealers, and insurance companies compete on a level playing field; that is, when all companies disclose their fees, no one company is allowed to unfairly benefit and to lure unsuspecting investors by hiding some or all of its fees.

12.   Defendant—a nationwide life insurance and annuity company and one of California's

largest and most profitable 403(b) vendors—systematically violates the Code. Specifically, Defendant fails to disclose on 403bcompare.com numerous hefty expenses, direct and indirect, that it passes on to California's public school teachers who purchase Defendant's indexed annuities. For example, Defendant fails to disclose that its fees are among the highest in the state—averaging over 3.1% per year since 2019—and that its sales agents are among the highest paid—earning commissions between 8 and 10 percent of assets invested—all of which have resulted in Defendant's customers seeing some of the state's lowest returns on their investments. Fees this high are disastrous for teachers trying to save for retirement, cutting their nest egg nearly in half by the time of their retirement.

13.    The below illustration[1] demonstrates the impact that differences in fees have on annuity returns over time:



BY THE NUMBERS
Total value of investment after 35 years, assuming $250 contributed monthly with an 6% average annual return:

14.    Defendant's conduct, which violates the Code, has enabled Defendant to thrive in the California 403(b) market for public school teachers—at the expense of educators and those 403(b) vendors that *do* comply with the Code's disclosure requirements. By hiding its fees, Defendant has lured unsuspecting teachers into its poorly performing products and away from better products sold by vendors that disclose their fees, as required.

---

[1] Illustration taken from https://403bwise.org/education/bad-403b (last visited Feb. 24, 2023).

3

15.     Plaintiffs are such teachers. For example, over the last several years, Plaintiff Taylor has paid tens of thousands of dollars to Defendant in unlawful, undisclosed fees on her poorly performing indexed annuity.

16.     On behalf of themselves and a Class of similarly situated individuals, Plaintiffs bring claims pursuant to the UCL seeking redress for Defendant's unlawful and unfair conduct. Under California law, Plaintiffs and the Class are entitled to equitable restitution. Plaintiffs and the Class also seek injunctive relief requiring Defendant to provide the required disclosures moving forward, which will safeguard against future illegal practices by Defendant.

**PARTIES**

17.     Individual and representative Plaintiff Veronica L. Taylor ("Taylor") is a resident of Salinas, California. Taylor taught sixth grade in California public schools for 33 years before retiring in June 2020 spending the last 25 years of her career in Alisal Union School District.

18.     Taylor has been invested in a 403(b) product offered by Defendant called MNL Endeavor 12 from 2016 to the present. Over the past four years, Taylor has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

19.     Individual and representative Plaintiff Deann Fallas ("Fallas") is a resident of Bakersfield, California. Fallas has been an elementary school teacher in the Delano Union School District for 17 years.

20.     Fallas was invested in a 403(b) product offered by Defendant called MNL Innovator Choice from 2007 until March 2020. Within the past four years, Fallas has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

21.     Individual and representative Plaintiff Katharine Bartlett ("Bartlett") is a resident of Mountain View, California. Bartlett has been a kindergarten teacher in California public schools for 30 years, the past 23 of which have been spent in the Santa Clara Unified School District.

22.     Bartlett has been invested in a 403(b) product offered by Defendant called MNL

4

Endeavor 12 Plus from 2018 to the present. Within the past four years, Bartlett has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

23.     Individual and representative Plaintiff Vahe Amirian ("Amirian") is a resident of Canyon Country, California. Amirian has worked in California public schools as a school psychologist in Los Angeles, Bakersfield, and Palmdale for 18 years, the last four of which have been in the Westside Union School District.

24.     Amirian has been invested in a 403(b) product offered by Defendant called MNL Capstone 14 from 2015 to the present. He began contributing to this product in 2015 when he was employed by the Greenfield Union School District located in Bakersfield, California. Within the past four years, Amirian has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

25.     Individual and representative Plaintiff Phillip I. Cohen ("Cohen") is a resident of Pacific Palisades, California. Cohen worked in California public schools as a Resource Specialist/Special Day Class teacher for 40 years, the last 32 of which were spent in the Los Angeles County Office of Education.

26.     Cohen was invested in a 403(b) product offered by Defendant called Veridian Plus from 2005 until 2020. Within the past four years, Cohen has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

27.     Individual and representative Plaintiff Maria De Altonaga ("De Altonaga") is a resident of Hayward, California. Before recently retiring, De Altonaga spent the prior 18 years teaching elementary school children as a Bilingual Alternative General Education Teacher within the Hayward Unified School District.

28.     De Altonaga was invested in a 403(b) product offered by Defendant called MLN IndexBuilder 10 from 2016 to the present. Within the past four years, De Altonaga has incurred fees within this product that were illegal pursuant to Cal. Educ. Code§§ 25101, 25107 because they were

not disclosed as required by the Code.

29.    Defendant Midland is a member of the Sammons Financial Group, Inc., a holding company whose member companies offer financial service and retirement products.

30.    Midland is incorporated in Iowa and its principal place of business is West Des Moines, Iowa.

31.    Midland describes itself as "a leading provider of annuities and life insurance."[2]

32.    Midland operates in 49 states (including California) and the District of Columbia, and tens of thousands of independent agents are registered to sell Midland insurance products.[3]

33.    Midland now "holds over 1 million annuity and life insurance policies, with assets of over $74.3 billion in 2021."[4]

## JURISDICTION AND VENUE

34.    Plaintiffs initially filed this case in Monterey County Superior Court.  Defendant removed the complaint asserting jurisdiction under 28 U.S.C. § 1453(b) (ECF No. 1).

35.    Defendant conducts business, including advertising and selling life insurance and annuity products, in the state of California.

36.    The amount in controversy, exclusive of interest, costs, and attorneys' fees, exceeds the minimum jurisdictional amount for this Court.

37.    This Court has jurisdiction over the claims for restitution arising from Defendant's unlawful business practices under the UCL.

38.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1441(a).

39.    Divisional Assignment.  Pursuant to L.R. 3-2(c), this action should be assigned to the San Jose Division, as a substantial part of the events giving rise to the claims occurred in Monterey County.

---

[2] See https://www.midlandnational.com/midland-national-history (last visited Dec. 29, 2022).
[3] See https://www.midlandnational.com/midlandadvisory-whoweare (last visited Dec. 29, 2022).
[4] Id.

**BACKGROUND**

**A. Overview of Retirement Landscape for California Public School Teachers: CalSTRS and 403(b) Annuities.**

40.    The California State Teachers' Retirement System ("CalSTRS") was established in 1913 to provide retirement benefits to California's public school educators via a pension.

41.    Today, CalSTRS administers retirement programs for about 880,000 members and is the largest educator-only pension fund in the world, and the second largest pension fund in the U.S.

42.    Importantly, California public school teachers do not contribute to or receive Social Security benefits. Instead, they only contribute to and receive benefits from CalSTRS. And, increasingly, the pension provided by CalSTRS is not enough to finance a teacher's retirement.

43.    According to CalSTRS, the average teacher who retired in 2020–21 had 25 years of service and a monthly benefit of $4,813, or $57,756 a year.[5]

44.    As the California Teachers Association warns, this "pension will not cover 100% of the income [teachers] need to live on in retirement….[F]or most people, their pension will cover only about 50% to 65% of the income they will need in retirement."[6]

45.    Between not receiving any Social Security benefits and the fact that CalSTRS does not provide sufficient retirement income, many California public school teachers decide to open supplemental personal retirement accounts, in the form of 403(b) plans, to hopefully accumulate enough funds to retire at a similar standard of living.

46.    The California Teachers Association urges its members to open a 403(b): "To help make sure you have enough income to live on in retirement, it is important to start a personal retirement savings plan, such as a 403(b)."[7]

47.    Similar to 401(k) plans, a 403(b) plan allows investors to contribute pre-tax money from their paychecks to certain investment products. Pre-tax contributions and investment earnings

---

[5]    *See*    https://edsource.org/2022/teachers-retirement-investments-had-a-negative-return-for-first-time-since-great-recession/676191 (last visited Dec. 27, 2022).
[6]    *See*    https://ctainvest.org/the-academy/your-retirement-journey/overview-of-retirement-benefits (last visited Dec. 27, 2022).
[7] *Id.*

are not taxed until the money is withdrawn, usually in retirement. This allows money to grow tax free over time, and to be withdrawn at a time when many teachers' tax brackets will presumably be lower than when they were working full-time.

48.    In 1961, the insurance industry introduced the "tax-sheltered annuity" (or "TSA"). Between 1961 and 1974, only TSAs were allowed in 403(b) plans.

49.    In 1974, Congress passed the Employee Retirement Income Security Act ("ERISA"), allowing mutual funds to be used within 403(b) plans.

50.    Currently, there are two main types of investments allowed in 403(b) plans: (1) mutual funds, which are pooled investments owned by many investors and sold by mutual fund companies, and (2) annuities, which are individual insurance products sold by insurance companies.

51.    Despite the fact that mutual funds have been allowed in 403(b) plans for nearly fifty years, insurance providers selling annuities have held onto a large share of the 403(b) market in California. This is true for two primary reasons. First, mutual fund companies were slow to enter the California 403(b) market after the passage of ERISA. Second, insurance companies successfully lobbied the California Legislature to amend state insurance law to prevent school districts from negotiating terms with particular insurance providers and to instead provide that school districts must remit payroll deductions to whichever insurance provider an employee chooses. *See* Cal. Ins. Code § 770.3. This gave insurance companies direct access to educators. It also prohibited school districts from excluding vendors based on the quality of their products or the level of their fees, even though such exclusions are typical for employers who offer 401(k) plans.

52.    In summary, but for the disclosures required by the Code, educators deciding how to invest their 403(b) plan have little in the way of reliable information. There is no guidance from school districts and little guidance from the state about what to invest in. And there are no restraints on which vendors can offer products, which agents are allowed to offer those products (agents need not obtain securities licensure), the tactics those agents can use, or how those agents are compensated. As a result, but for the information required to be disclosed by the Code, most teachers would pick investments based on the advice of commissioned salespeople, who themselves offer the products

that pay them the highest commissions. These commissioned salespeople continue to funnel California public school teachers into the 403(b) products that pay them the highest commissions: annuities.

53.    The Code was intended to break the hold of annuity vendors, by affirmatively providing truthful and relevant investment information to teachers.

**B. Common Types of Annuities.**

54.    An annuity is a contract between an individual and insurance company under which the individual makes a lump-sum payment or series of payments and, in return, receives a promise of regular disbursements from the insurance company for a specified future period of time or for the remainder of the individual's life.[8] In an *immediate annuity*, the payments start at the time of the initial investment. In a *deferred annuity*, the payments start at some future date decided by the investor, or the money can be withdrawn and the account closed. Until that time, the payments earn interest. This case concerns deferred annuities.

55.    There are several types of deferred annuities including fixed annuities and variable annuities. This case concerns a third kind of deferred annuity referred to as an indexed annuity.

56.    An indexed annuity (also known as an index annuity, an equity-indexed annuity, a fixed indexed annuity, or an index-linked annuity) pays an interest rate tied to the performance of a specified market index, such as the S&P 500 or the Dow Jones Industrial Average. The insurance company does not invest the investor's money in that underlying market index, but instead invests the money in its general account. The insurance company uses a portion of the earnings it expects to generate to buy derivative instruments that capture a portion of the market's returns, which are then passed along to investors (in part). The insurance company then keeps the rest of the returns generated by the derivatives for itself along with the unused portion of the earnings from its general account.

**C. The Problems with the 403(b) Marketplace for California Teachers, and the State Legislature's Attempt to Fix It.**

57.    As discussed above, but for the disclosures required by the Code, California teachers

---

[8] *See* https://www.investopedia.com/terms/a/annuity.asp (last visited Dec. 27, 2022).

were left on their own to make decisions about their retirement savings, and have been largely funneled into high-cost indexed annuities. These annuities often involve opaque earnings formulas and high (and confusing) fees, which result in exorbitant profits for insurance companies and low returns for educators.

58.     Making matters worse is the fact that California teachers have historically been confronted by an overwhelming number of 403(b) options, which vary greatly across school districts. Each California school district chooses a financial company as the third-party administrator (or "TPA") of its supplemental retirement programs. The result is an inconsistent and messy web of options available to teachers: "More than 50 firms are approved to be [TPAs] in California, and they can offer more than 120 different financial products to teachers….Companies may offer all of them, or only some. It varies from district to district, and there are more than 1,000 districts in California."[9]

59.     California teachers are thus inundated with 403(b) plan options—which change if a teacher changes school districts—and have had limited means to evaluate differences across annuity products.

60.     The result is that, absent disclosures like those required by the Code, commission-based agents will funnel teachers into indexed annuities from companies like Midland because those products pay among the highest commissions of any 403(b) product on the marketplace, while the teachers (1) cannot learn about all of the fees associated with those products, and (2) are not made aware of better, less expensive alternatives available to them.

61.     Recognizing that public school district employees should not be taken advantage of when planning for retirement, the California Legislature attempted to ensure that these public servants at least have access to critical, accurate, and easy-to-use information about the 403(b) products available to them. With this information, educators have the means to make better informed decisions when selecting a supplemental retirement savings plan.

### 1. The Code

62.     Recognizing that "undisclosed fees, penalties, and restrictions" were "erod[ing]

---

[9]     *See*     https://www.mercurynews.com/2022/03/12/teachers-school-employees-may-be-paying-thousands-in-extra-fees-on-retirement-accounts/ (emphasis added) (last visited Dec. 28, 2022).

[teachers'] savings" as they "struggle to budget for their retirement,"[10] the Legislature passed Cal. Educ. Code § 25100, *et seq.* (the "Code"), which mandated several key protections to ensure public school employees have the information they need and deserve when planning for retirement.

63.    First, the Code requires that prospective vendors that offer 403(b) products to California public school employees register those products with the Teachers' Retirement Board. Cal. Educ. Code § 25101. The Code established a state-sponsored "impartial investment information bank" via a website created in 2004, through which the Teachers' Retirement Board provides information on registered 403(b) products. Cal. Educ. Code § 25104(a). This website— **403bcompare.com**—contains *all* information within the investment information bank.

64.    Second, the Code requires that, on the Website, every 403(b) product vendor provide "[a] disclosure of all expenses paid directly or indirectly by retirement plan participants, including, but not limited to, penalties for early withdrawals, declining or fixed withdrawal charges, surrender or deposit charges, management fees, and annual fees…." for every product offered. Cal. Educ. Code § 25101(a)(3); *see also* Cal. Educ. Code § 25101(a) (requiring that such disclosures be included in "the impartial investment information bank established pursuant to Section 25104"). This disclosure obligation is placed entirely on vendors, including Midland. Under the Code, the Board is "not responsible for, and may not be held liable for the adequacy of the information provided by the participating vendors contained in the information bank." Cal. Educ. Code § 25109. The Code further provides that the Board maintains the information bank "only to provide information supplied by the participating vendors." *Id.* Consistent with the Code, the Board does not police 403bcompare.com. The Board has never removed a vendor based on the content or incompleteness of its submissions on 403bcompare.com and has never removed a vendor or a specific product, other than at the vendor's request.

65.    Third—and indicating just how seriously the required disclosures are to be taken—the Code provides that "[a] vendor may not charge a fee associated with a registered 403(b) product that is not disclosed, pursuant to Section 25101." Cal. Educ. Code § 25107. In other words, any fee

---

[10] California Bill Analysis, A.B. 2506 Assembly Committee, April 16, 2002.

associated with a 403(b) product that is not disclosed on 403bcompare.com is *per se* illegal.

66.     All told, the Code is designed to force 403(b) providers to be fully transparent with teachers about the fees associated with their 403(b) products so that teachers can understand the full range of expenses, whether "paid directly or indirectly," that they will be charged. Cal. Educ. Code § 25101. *See also* California Bill Analysis, A.B. 2506 Senate, Aug. 19, 2002 (explaining that the Code requires "[d]isclosure of expenses paid by retirement plan participants, types of products, product features, and services offered to participants."); *id.* ("Many teachers struggle to budget for their retirement, only to discover that undisclosed fees, penalties, and restrictions erode their savings."). The Code, and its creation of an accessible and publicly available website, is also meant to allow teachers to exchange notes and ideas related to their supplemental retirement options.

67.     Moreover, 403(b) vendors' disclosure obligations under the Code are necessarily ongoing. Cal. Educ. Code § 25102. That is, vendors must update the details about their direct and indirect fees on 403bcompare.com so that even after teachers purchase an annuity, they can continue to evaluate potential changes to their investment strategy. This continuing requirement is important, given that contract terms that determine an indexed annuity's earnings (*i.e.*, caps, spreads, and participation rates) change on a monthly basis. When these changes occur, teachers have the option to move their money to a new 403(b) investment, direct their future contributions to a different product, or shift their balance and/or future contributions to a different strategy within their existing annuity.

68.     Additionally, the Code's requirement that 403(b) vendors disclose their fees on an ongoing basis also protects educators against risks associated with replacing an annuity altogether. Because many agents receive hefty up-front commissions each time they sell a new product, agents are incentivized to churn teachers for commissions by switching them from one annuity to another. It is essential that teachers have the information necessary to compare their current annuity to any new annuities they might be offered.

69.     Further, the Code's disclosure requirements are critical to supporting fair competition among 403(b) providers that cater to California's public educators. By requiring that all vendors

disclose all their fees, the Code creates a level playing field. Indeed, it would be manifestly *un*fair to competition (and, of course, educators) to allow one provider to lure teachers into buying its products by hiding some or all of its fees, while other providers fully disclose theirs. The Code's comprehensive inclusion of all expenses paid by teachers is a critical mechanism for ensuring fair competition.[11]

### 2.  The Website

70.    Once a 403(b) vendor is registered to offer 403(b) products, it is given login information for 403bcompare.com that allows it to edit general information about the vendor, add new products, and make changes to the entries associated with existing products. Every product offered by a vendor has its own page that the insurance company can quickly and directly update as information about that product changes.

71.    The information disclosed for a particular product varies based on its type: mutual fund, variable annuity, indexed annuity, and fixed annuity.

72.    For each product type, there are certain pre-defined categories of disclosures (*i.e.*, investment information and fees) and then sub-categories frequently associated with the product type. For indexed annuities, these sub-categories include things such as "Indexing and Index Crediting Methodology," "Riders," "Minimum Rate of Return," and "Caps, Spread, and Participation."

73.    The Website allows vendors to leave spaces for pre-defined categories or sub-categories associated with a given product blank, *i.e.* there are no "required fields" on the Website's form. If the vendor does not include information related to a particular category in its submission to the Board via the Website, the category itself does not appear on the product page.

74.    In addition to the non-mandatory pre-established fields, the Website provides vendors

---

[11] *Compare* Securities & Exchange Comm'n Division of Investment Management, *Report on Mutual Fund Fees and Expenses* (Dec. 2000) at note 2 ("The Random House College Dictionary defines a fee as 'a charge or payment for services,' Random House College Dictionary 484 (Revised 1st Ed. 1982), and defines an expense as any 'cost or charge.' *Id.* at 465. We use the terms interchangeably in this report.") *with* SEC Office of Investor Education, *Investor Bulletin: How Fees & Expenses Affect Your Investment Portfolio* (June 26, 2019) ("Fees typically come in two types—transaction fees and ongoing fees. Transaction fees are charged each time you enter into a transaction, for example, when you buy a stock or mutual fund. In contrast, ongoing fees *or expenses* are charges you incur regularly.") (emphasis added).

FIRST AMENDED COMPLAINT
Case No. 5:23-cv-04125-PCP

with ample opportunity to satisfy their statutory disclosure requirements. The Product Details tab allows providers to write an overall description of the product of up to 800 characters. The Fees and Charges tab allows vendors to create custom entries where the vendor provides the name of the fee, indicates the percentage or dollar amount, and provides a description of what the fee covers and when it is incurred. Many of the product feature sub-categories include a text box to insert as much or as little information as the vendor chooses.

75.     The Website allows participants to then compare different products to facilitate well-informed choices. The compare feature allows participants to compare specific sub-categories of information across different products. 403bcompare.com is not only for the evaluation of a potential purchase; it is also intended to benefit investors wanting to reevaluate their current product.

76.     Finally, 403bcompare.com allows vendors to designate a product as "Discontinued," meaning that it is no longer offered to new investors. The label is displayed prominently near the top of the product page, and also shown in the list of a vendor's registered 403(b) products. Therefore, vendors can also provide up-to-date information about products that are currently owned by teachers but are no longer being sold.

77.     For a product that has been marked as discontinued, but whose product information needs to be updated, the vendor can either re-active the product, update the product information, and then once again mark the product as Discontinued, or the vendor can delete the product information page, and then re-register the same product. Using either method, the Website permits the company to use the same product name and the same product number.

### D. How Defendant's Indexed Annuities Operate

78.     With an indexed annuity, the investor's money is not actually invested in the specified market index. An indexed annuity is therefore not defined as a security, but instead as an insurance product, wherein the investor cannot lose money, and earns interest based on a complicated formula created by the insurance company, with returns *tied* in some manner to a broad-based securities index. The returns from an indexed annuity are determined by two factors: the "*Crediting Strategy*" (*i.e.*, the index that returns are linked to, how returns are calculated, and the time period over which they

are calculated), and *Fees*, including both direct and indirect fees (*i.e.*, contractual terms through which the amount of interest added to the annuity is lower than the actual growth of the underlying index).

### 1. *Crediting Strategy*

79.   The Crediting Strategy determines the maximum potential return an investor could receive. Most indexed annuities offer several Crediting Strategies to choose from and allow investors to divide their money between multiple Strategies.

80.   The first component of a Crediting Strategy is the *index* to which returns are tied. The most common Strategy ties returns to the S&P 500, an index of large U.S. companies. Many Strategies are tied to the stock market, but that is not a requirement. For example, Defendant offers several Crediting Strategies tied to the Fidelity Multifactor Yield Index 5% ER, an index that combines stocks and bonds.

81.   The second component of a Crediting Strategy is the *calculation methodology* that determines how the investor's returns will be determined in relation to the index's performance. For example, a "point-to-point" Crediting Strategy measures returns by comparing the index's value on the first and last days of the year, with the return being the amount that index has risen or fallen.

82.   The final component of a Crediting Strategy is the *time period* over which the return is calculated (and the insurance company holds the investor's money) (the "Crediting Period"). One year is standard (and the default period where the Strategy does not list the Crediting Period), though some Crediting Strategies operate over a two-year period. Interest is credited at the end of the Crediting Period. Unless the investor elects otherwise, at the end of each Crediting Period the investor's initial investment plus the credited interest rolls into a new Crediting Period.

83.   For example, Plaintiff Taylor's money was divided between three Crediting Strategies. One was a monthly point-to-point tied to the S&P 500. The second was an annual point-to-point tied to the same index. The third was an annual point-to-point Strategy tied to the S&P 500 Low Volatility Daily Risk Control 5% Target Index.

84.   Crediting Strategies remain fixed even when money rolls from one Crediting Period to the next.

85.     The returns that investors earn from the Crediting Strategy in Defendant's indexed annuities are reduced by two types of fees: **direct** fees, which are charges that directly reduce the investor's account balance, and **indirect** fees, which are earnings generated by the investor's money that the vendor retains, or the contractual terms that produce that result. *See* California State Teachers' Retirement System, *403(b) & 457(b) Fundamentals Topics*, at https://www.403bcompare.com/Fundamentals403bAnd457b#ProductFees (identifying types of "Product Fees" and explaining that "[s]ome products claim to have no fees. Be wary of these products. They typically are products that have a low fixed rate of return. The return is low because they are taking the fees out of your returns. Hence, they are 'baked into the product' itself.") (last visited Mar. 2, 2023).

### 2. Direct Fees

86.     **Riders.** When an investor signs up for an indexed annuity, they can choose to purchase a "rider," which provides additional features in the contract. Riders may provide additional flexibility regarding when money can be withdrawn without penalty (*e.g.*, disability or nursing home confinement), how money is credited (*e.g.*, provides a boost to the Crediting Strategies or limits the fees), or how much money can be withdrawn (*e.g.*, allowing guaranteed minimum withdrawal amounts where certain criteria are met). Most riders come with a direct fee that is deducted from the contract value. These riders can cost up to 1.75% of the account value annually.

### 3. Indirect Fees

87.     The returns generated by a particular Crediting Strategy are also subject to indirect fees.[12] Indirect fees are imposed by the insurance company at the beginning of the Crediting Period and are locked in for the duration of that Period.

88.     Unlike Crediting Strategies, however, indirect fees are subject to change from Crediting Period to Crediting Period, without consent or advanced notice.

---

[12] Defendant Midland uses the term "index crediting parameters" to refer to what Plaintiffs have defined herein as "indirect fees." *See* Midland National Life Insurance 2020 Annual Report, Exhibit 5, at 6, *available at* https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2020/lifeAndDisability/annual/66044.2020.L.AN.PN.O.M.4065694.pdf (last visited Mar. 2, 2023).

89.     Defendant Midland sets the indirect fees for each of its products at a level that will (1) generate enough money to cover Midland's expenses, (2) generate Midland's desired level of profits, and (3) allow Midland to purchase derivative securities that will pay all interest potentially due to investors without any risk of losses to Midland if markets decline, while also allocating a share of the income from those derivatives to Midland when markets rise. To accomplish these ends, Midland's indexed annuities contain several key indirect fees.

90.     **Caps.** A cap is an upper limit on how much of the Crediting Strategy's returns can be credited to an investor's account. For example, for the annual period beginning in November 2018, Plaintiff Taylor had $32,176 invested in a S&P 500 point-to-point one-year Crediting Strategy. The index gained over 17% by the end of the annual Crediting Period. However, Midland imposed a 2% cap, so Taylor was credited with $644 (a 2% gain) rather than $5,470 (a 17% gain). Similarly, Plaintiff Fallas only earned 2% interest ($104) in the fourth quarter of 2019 on the $5,200 she invested in the S&P 500 point-to-point Crediting Strategy during the Crediting Period starting a year earlier, despite the S&P 500 going up 30.43% in 2019. Fallas would have earned over $1,500 in interest were it not for the 2% cap imposed by Midland. Plaintiff Amirian would have earned $23,260 in interest in his account in 2021 from his S&P 500 Crediting Strategy, but instead earned only $1,354 for the year because of a 2% cap imposed by Midland.

91.     **Participation rates.** Participation rates are the percentage of an index's returns that are credited to an annuity. Where a participation rate is imposed, the investor is only credited with the portion of the Crediting Strategy's return equal to the participation rate. For example, if the Crediting Strategy gains 10% but the participation rate is 30%, the investor's return is 3%. A "participation rate" is functionally a floating cap, expressed as a percentage of market returns.

92.     **Spread fees.** The spread fee (commonly referred to as an asset fee, margin fee, or administrative fee) is a percentage amount that is subtracted from any gain generated by the Crediting Strategy. For example, Plaintiff Taylor had $67,946.05 invested in a S&P 500 Low Volatility Crediting Strategy as of November 2018. The Strategy returned 9% over the one-year period, but Midland imposed a 4.9% spread fee. As a result, Plaintiff Taylor was credited with $2,792,

1   representing a 4.1% return (9% minus the 4.9% spread fee = 4.1% return). Plaintiff Bartlett's returns

2   for 2021 were reduced by a roughly 3% spread fee Midland imposed on her S&P 500 Low Volatility

3   Crediting Strategy. Plaintiff Cohen earned only 0.9% interest from his Nasdaq-100 Crediting Strategy

4   in 2019 despite the index rising 7.9% during the Crediting Period because of a 7% spread fee imposed

5   by Midland. Plaintiff De Altonaga's returns 2021 were reduced by the 3.75% spread fee Midland

6   imposed on her S&P 500 Low Volatility Crediting Strategy.

7       93.   Caps, participation rates, and spread fees are indirect fees paid by investors. As the

8   Securities and Exchange Commission ("SEC") has explained, "Indexed annuities typically use one

9   or more features that restrict the positive return that is applied to your annuity contract value . . .

10   [Participation rates, rate caps, and spread fees] can reduce your return in the same way that a direct

11   fee would even if the annuity is called a 'no fee' annuity."[13]

12       94.   The National Association of Insurance Commissioners ("NAIC") also refers to the

13   aforementioned items as "fees." "Participation rates, cap rates, and spread rates (sometimes called

14   margin or asset fees) are all terms that describe ways the amount of interest added to your annuity

15   may not reflect the full change in the index." *See* NAIC, Buyer's Guide for Fixed Deferred Annuities,

16   2013, at 4 (available at https://content.naic.org/sites/default/files/publication-anb-lp-consumer-

17   annuities-fixed.pdf).

18       95.   Defendant Midland's submissions to the State of California Insurance Commissioner

19   confirm that Midland sets the caps, participation rates, and spread fees in its indexed annuities to meet

20   the company's revenue and profitability targets.[14]

21       96.   The fees paid directly and indirectly by investors add up to Defendant Midland

22

---

[13] Securities and Exchange Commission Office of Investor Education and Advocacy, *Updated Investor Bulletin: Indexed Annuities*, July 31, 2020, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_indexedannuities. The SEC is an important entity under the Code, as Cal. Educ. Code § 25106 provides that the board should look to the SEC, the Internal Revenue Services ("IRS"), and the National Association of Insurance Commissioners ("NAIC") as sources for the "[d]efinitions or explanations of all fees referred to in the investment information bank."

[14] *See* Midland 2020 Annual Report, Exhibit 5, at 6; Midland National Life Insurance 2020 Annual Report, Management Discussion and Analysis, at 6, *available at* https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2020/lifeAndDisability/annual/6604 4.2020.L.AN.PM.O.A.4096070.pdf (last visited Mar. 3, 2023).

charging some of the highest fees within any 403(b) product offered in California. Between 2019 and 2022, Midland collected $2.6 billion from investors in indexed annuities on roughly $21 billion of account balances held in these products in the United States.

97.     This translates to costs of approximately **3.1% per year** within the indexed annuity 403(b) products that Midland offers California public school employees. This is nearly double the 1.78% charged by the average 403(b) product in California,[15] and three times the median cost of 1.04% within the 6,000 403(b) investment options surveyed by the U.S. Government Accountability Office ("GAO") in its 2022 report.[16] And these averages likely overstate the fees paid by the average 403(b) investor.[17] As advocates for 403(b) reform explain, over a 35-year career of investing $250 per month, a 3% fee (0.40% *lower* than what Defendant collects on average) in a 403(b) investment product will **cut a teacher's retirement savings <u>almost in half</u>** compared to a low-cost 403(b) investment option.[18] *See infra* Chart at ¶ 13.

---

[15] *See* https://403bwise.org/education/403b-fact-sheet (last visited Feb. 27, 2023).

[16] *See* United States Government Accountability Office, *Defined Contribution Plans: 403(b) Investment Options, Fees, and Other Characteristics Varied* (2022) at 34 (showing median investment expense of .90% of over 6,000 investment options surveyed that cost between 0.02% and 3.74%), 46 (showing median administrative fees of 0.1425%), *available at* https://www.gao.gov/assets/gao-22-104439.pdf.

[17] The averages stated herein and *supra* in notes 15 and 16 are simple averages that assume the same amount of money is invested in every 403(b) product offered in California, with money spread evenly between every investment option available within that product. This is a flawed assumption, however, because products and investment options with more assets have greater economies of scale, and thus tend to charge lower fees (especially in a well-functioning marketplace with pricing transparency). As the Investment Company Institute—the mutual fund industry's trade organization—has explained, "asset-weighted averages . . . [of] the expenses and fees that shareholders pay through funds . . . are preferable to simple averages, which would overstate the expenses and fees of funds in which investors hold few dollars." Investment Company Institute, 2022 INVESTMENT COMPANY FACT BOOK, at 99, https://www.ici.org/doc-server/pdf%3A2022_factbook.pdf. So while the average expense ratio for equity mutual funds was 1.13 percent in 2021, "[t]he asset-weighted average expense ratio for equity mutual funds (the average shareholders *actually* paid) was far lower, at 0.47 percent." *Id.* at 102 (emphasis added). This suggests that the average 403(b) investor in California is paying far less than the 1.78% average among the products on 403bcompare.

[18] *See* https://403bwise.org/education/bad-403b (last visited Mar. 2, 2023).

**DEFENDANT'S ROUTINE FAILURE TO DISCLOSE FEES**

**A. Defendant Midland Routinely Violates the Code by Charging Fees Associated With Its 403(b) Indexed Annuity Products that Defendant Fails to Disclose.**

98.     Defendant is the largest provider of indexed annuities to California public school teachers and one of the largest 403(b) vendors in California.

99.     Yet, despite the clear purpose and language of the Code, public school employees routinely incur direct and indirect expenses within Defendant Midland's products that are not disclosed on 403bcompare.com.

100.    Not only does Defendant collect undisclosed and unauthorized fees in violation of the Code, it also engages in unfair competition, including unlawful and unfair business acts or practices, in violation of the UCL.

101.    Defendant fails to disclose many of its fees on 403bcompare.com, including whether it imposes such fees and if it does, the amount of each fee.

102.    Indeed, on some of its product pages on 403bcompare.com, Defendant discloses the *type* of fee—*e.g.*, a cap—under the "Product Details" tab, but does not provide the *rate*. For example, on the "MNL Endeavor 12 and 12 Plus" product page, under "CAPS, SPREAD, AND PARTICIPATION," Defendant merely states that: "The Cap rate is applied to each of the Indexed Accounts. This rate, which is based upon current economic conditions, is declared each contract anniversary. Upon issue, the minimum Index Cap Rate will be guaranteed for the entire term of your contract."[19]



103.    Moreover, under the tab "Fees and Charges," Defendant does not say anything about

---

[19] *See* https://www.403bcompare.com/products/174 (last visited Dec. 28, 2022).

caps, spreads, or participation rates.[20]

104.    This lack of disclosure does not mean that there is no relevant information to disclose. As of November 27, 2021, all three fee types discussed here—caps, spread fees, and participation rates—were being imposed on every Crediting Strategy within the MNL Endeavor 12 Plus policy.

105.    For another product, "MNL IndexBuilder 10," Defendant says even less about "CAPS, SPREAD, AND PARTICIPATION" under the "Product Details" tab, merely directing teachers to "Contact your agent for rates."[21]



106.    And, again, under the tab "Fees and Charges," Defendant does not say anything about caps, spread fees, or participation rates.

107.    Defendant's failure to disclose the terms of its caps, spread fees, and participation rates is unusual. Across 403bcompare.com, other 403(b) vendors provide the disclosures required by the Code.

108.    For example, one product page from another vendor provides a detailed description of the product's cap (currently set at 2.9% and guaranteed to never go below 2%), as well as the current participation rate (100%).[22]

---

[20] *Id.*
[21] *See* https://www.403bcompare.com/products/218 (last visited Dec. 28, 2022).
[22] *See* https://www.403bcompare.com/products/158 (last visited Dec. 28, 2022).

109.    Another vendor provides similarly detailed information about its caps and participation rates.[23]



110.    The actual rates used for caps, spreads, and participation rates are what matter to investors, and what enables them to compare different vendors and products, as these terms have huge impacts on account values. For example, had Defendant fulfilled its requirements under the statute, Plaintiff Taylor and Plaintiff Bartlett could have compared the fees imposed by MNL Endeavor 12 Plus against those imposed by two of its competitors:

111.    Indeed, recognizing the importance of its specific fees, Defendant routinely discloses them to its *sales agents*, in painstaking detail.[24] However, Defendant fails to share this same

---

[23] *See* https://www.403bcompare.com/products/197 (last visited Dec. 28, 2022).
[24]        *See*         https://www.midlandnational.com/documents/35453/5632685/6745Y+-+Interest+Rates/2fbbbf73-5b92-44c5-85d7-e7796e98d629 (showing crediting rates and fees in effect as of December 1, 2022) (last visited Mar. 2, 2023).

information with the public educators who are legally entitled to it. In fact, Defendant directs sales agents *not* to share the rates with teachers, explaining that such details are "for financial professional use only." *Id.*

112.    Plaintiffs Taylor, Bartlett, and De Altonaga are three such California public educators to whom Defendant failed to disclose 403(b) plan caps, spreads, and participation rates on 403bcompare.com.

113.    Plaintiffs Taylor and Bartlett purchased the since-discontinued "MNL Endeavor 12 Plus" indexed annuity product from Defendant. Taylor's policy was issued on November 28, 2016, approximately fourteen years after the passage of the Code. Plaintiff Bartlett's policy was issued November 6, 2018.

114.    Plaintiff De Altonaga purchased the "MLN IndexBuilder 10" indexed annuity product from Defendant. De Altonaga's policy was issued on March 30, 2016, approximately fourteen years after the passage of the Code.

115.    However, when Plaintiffs Taylor, Bartlett, and Altonaga initially selected these products and each year thereafter, Defendant failed to disclose on 403bcompare.com (1) the fact that Plaintiffs would incur any fees at all, and (2) the types and amounts of the fees that would go into effect as of the contract anniversary date.

116.    Plaintiffs Cohen, Amirian, and Fallas were each in Midland products purchased after passage of the Code and made 403(b) contributions to those products via payroll deduction through their school districts. Yet Midland either never registered the Innovator Choice, Capstone 14, and Veridian Plus products, or has removed them from the Website, despite the fact that thousands of California public school employees have 403(b) accounts invested in those products. Thus none of the fees incurred by Cohen, Amirian, and Fallas over the past four years were disclosed on 403bcompare.com.

117.    Having failed to disclose these fees, Defendant was not authorized to charge them. *See* Cal. Educ. Code § 25107.

FIRST AMENDED COMPLAINT
Case No. 5:23-cv-04125-PCP

**B. Defendant's Rider Fees are Direct Fees, and Are not Properly Disclosed to California Public School Teachers.**

118.     Rider fees are "expenses paid directly…by retirement plan participants" and therefore must be disclosed, or otherwise cannot be charged, by Defendant. *See* Cal. Educ. Code §§ 25101(a)(3), 25107.

119.     However, Defendant fails to disclose on 403bcompare.com the full range of riders it offers and the details of such direct fees.

120.     For example, on the product page for "MNL Endeavor 12 and 12 Plus," under the "Product Details" tab, in a section titled "RIDERS," Defendant defines what a rider is and then lists only one rider—a "Nursing Home Rider"—available for the product.



RIDERS

Riders are amendments to the annuity contract that typically add to your costs. make sure you inquire about any additional costs. The following riders exist for this product:

Other

Nursing Home Rider:
After the first contract anniversary, should the annuitant become confined to a qualified nursing home facility for at least 90 consecutive days, we will increase the penalty-free withdrawal amount up to 20% of the accumulation value each year while the annuitant is confined. For issues ages 75 and younger, this rider is automatically included in the annuity at no charge.

121.     And, again, under the tab "Fees and Charges," Defendant does not say anything about riders.

122.     But the Nursing Home Rider is *not* the only rider available with the MNL Endeavor 12 and 12 Plus product. When purchasing this since-discontinued product from Defendant, Plaintiff Taylor also purchased the "Retire X-Cel Rider," a guaranteed minimum withdrawal benefit that allows for withdrawals from the account at a particular rate, beginning at a particular age (so long as certain conditions are met). This rider carried an annual charge of 0.95%.

123.     However, when Plaintiff Taylor initially selected this rider and each year thereafter, Defendant failed to disclose on 403bcompare.com (1) that this rider was offered with this product and (2) the rate charged for the rider, or that any fees would be charged at all.

124.     Defendant has charged Plaintiff Taylor over $7,500 in fees within the past six years

1   for the Retire X-Cel Rider.

2       125.    Having failed to disclose this direct fee, however, Defendant was not authorized to

3   charge it. *See* Cal. Educ. Code § 25107.

4                **THE CODE PROTECTS ALL TEACHERS BY PROTECTING THE MARKET**

5       126.    The Code protects teachers by requiring transparency in the market. It prevents

6   vendors from charging fees unless they are properly disclosed.

7       127.    Transparency encourages price competition. It drives down prices—in this case,

8   fees—by forcing vendors to compete for business. Vendors charge the same fees for a given product

9   at a given time to all purchasers. When transparency forces vendors to lower their fees to attract savvy

10   investors, less sophisticated investors benefit as well. The Code benefits not only the teachers who

11   compare fees between vendors, but also other teachers who pay lower fees without necessarily

12   realizing they are enjoying the fruits of competition.

13       128.    As the Supreme Court has explained, legislators intend retirement plan disclosure

14   requirements to benefit not only the employees who read them, but also their co-workers, who learn

15   the information through "fellow employees [] or informal workspace discussion." *CIGNA Corp. v.*

16   *Amara*, 563 U.S. 421, 444 (2011). Indeed, the information contained on the Website has become an

17   important tool in the 403(b) marketplace. The GAO relied on Website data in forming its 2022 report

18   to Congress on 403(b) plans,[25] and educators around the country rely on the Website for data on

19   investment products and their associated fees.[26] As of May 31, 2023, the Website has had 2,321,395

20   visitors over the past four years, averaging 1,429 per day.

21       129.    The effect of the Code's transparency requirement thus has widespread effects. So

22   does its enforcement mechanism: the ban on undisclosed fees. All investors are entitled to recover

23   hidden fees that vendors impose. The Code thereby protects all purchasers, whether a vendor

24

---

25   [25] GAO 403(b) Report at 34 (measuring median investment expense using data from the Website).

26   [26] Dan Otter, 403BWISE.COM, *How to Use 403bcompare.com*, Dec. 1, 2020 ("A [403bwise Facebook

27   Group] post . . . reminded me of another amazing tool: 403bcompare.com. This is a database of 403(b)
     fee and vendor information for products offered to California public school districts and community
     colleges. . . . [T]he beauty of the resource is that it can be used by virtually anyone in any state."),

28   available at https://403bwise.org/blog/entry/blog-403bcompare-praise.

complies with the transparency requirement and as a result is pressured to lower its fees or the vendor violates the transparency requirement and must disgorge the unlawful fees it charges.

## **CLASS ACTION ALLEGATIONS**

130. Plaintiffs bring their claims on behalf of themselves individually, and the following Class pursuant to Fed. R. Civ. P. 23:

> All public employees of all California local school districts, community college districts, county offices of education, and state employees of a state employer under the uniform state payroll system, excluding the California State University System, eligible to participate in an annuity contract and custodial account as described in Section 403(b) of the Internal Revenue Code of 1986 who, in the four years predating the filing of the initial complaint and continuing through the date the class list is prepared, were invested in an indexed annuity 403(b) product issued by Defendant and who paid fees that were not disclosed on 403bcompare.com.

131. Ascertainability: The Class satisfies the requirements of Fed. R. Civ. P. 23 as there is a well-defined community of interest in the litigation and the proposed Class is ascertainable from Defendant's records.

132. Numerosity: The Class is so numerous that joinder of all class members is impracticable. Given the volume of Defendant's business, there are hundreds or thousands of class members.

133. Commonality: This case presents common questions of law and fact, including but not limited to:

a) Whether Defendant violated the Code;

b) Whether Defendant's conduct was unlawful and unfair under the UCL;

c) The proper scope of injunctive relief; and

d) The proper measure of restitution.

134. Typicality: Plaintiffs' claims are typical of the members of the Class. The UCL violations suffered by Plaintiffs are typical of those suffered by other class members, and Defendant treated Plaintiffs consistently with other class members in accordance with its standard policies and practices.

135. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class

26

because they and their experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Class.

136.   <u>Predominance</u>: Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the UCL. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

137.   In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate actions.

138.   Yet, the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

**CLAIM FOR RELIEF**
**CAL. BUS. & PROF. CODE § 17200**
**On behalf of Plaintiffs Individually and the Class**

139.   Plaintiffs reiterate each of the allegations in the preceding paragraphs as if set forth at length herein.

140.   Plaintiffs and class members are "persons" within the meaning of Section 17201 of the UCL.

141.   Plaintiffs and class members lack an adequate legal remedy to obtain relief for the

1  violations of law and harms alleged above.

2  142.   The UCL defines "unfair competition" to include any unlawful, unfair, or fraudulent

3  business act or practice, and prohibits such acts or practices. Cal. Bus. & Prof. Code § 17200.

4  143.   Because the UCL is written in the disjunctive, a business act or practice need only

5  meet one of the three criteria—unlawful, unfair, or fraudulent—to be considered unfair competition.

6  144.   Defendant has engaged and continues to engage in unfair competition within the

7  meaning of the UCL because Defendant's conduct alleged herein is both unlawful and unfair.

8  145.   Defendant's conduct, as described herein, violates the UCL's "unlawful" prong.

9  146.   Defendant is a "vendor" within the meaning of Cal. Educ. Code § 25100(c)(2).

10 147.   As such, Defendant is required to make a "disclosure of all expenses paid directly or

11 indirectly by retirement plan participants, including, but not limited to, penalties for early

12 withdrawals, declining or fixed withdrawal charges, surrender or deposit charges, management fees,

13 and annual fees," which "shall be included in the impartial investment information bank established

14 pursuant to Section 25104" (*i.e.*, 403compare.com), and is prohibited from charging any fees

15 associated with its 403(b) products that are not so disclosed. Cal. Educ. Code § 25107; Cal. Educ.

16 Code § 25101.

17 148.   However, in violation of the Code, Defendant routinely charges fees on its 403(b)

18 products which are not disclosed on 403bcompare.com.

19 149.   Defendant's violations of the Code serve as predicate unlawful actions under the UCL.

20 150.   Separately, Defendant's conduct, as described herein, also violates the UCL's "unfair"

21 prong as Defendant's conduct is unfair to consumers, using any of the three standards used by

22 California courts in UCL consumer actions.

23 151.   <u>First</u>, Defendant's practices of charging undisclosed and hefty fees on its 403(b)

24 products are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,

25 and have caused harm to Plaintiffs and class members. The harm caused by these business practices—

26 *i.e.*, skimming tens of millions of dollars from the retirement savings of unsuspecting public

27 servants—vastly outweighs any legitimate utility they possibly could have.

28

152.   <u>Second</u>, the undisclosed fees within Defendant's 403(b) products (1) have caused, and continue to cause, substantial injury to Plaintiffs and class members; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by Plaintiffs and class members.

153.   <u>Third</u>, Defendant's conduct is also unfair as it significantly threatens or harms competition. By failing to disclose expenses, Defendant has made it appear as though its 403(b) products cost less than those offered by Defendant's competitors, who comply with the Code and disclose the full range of fees investors will pay within their 403(b) products. By hiding many of its fees, Defendant has managed to lure California public school teachers to invest in its products (which are, in many cases, objectively worse than other products available) and to emerge as a leading annuities provider to the state's educators. Defendant then traps these unknowing investors in its products by assessing surrender charges lasting between 8 and 14 years upon anybody who tries to get out of the investment. The Legislature's declared policy in the Code is that *all* 403(b) vendors must disclose *all* their fees. Given the Legislature's clear directive—which protects both educators and other vendors—Defendant's conduct violates the policy and spirit of the Code and is therefore unfair. Defendant's conduct provides Defendant an unfair advantage over its competitors, which comply with applicable disclosure requirements under the Code.

154.   As a result of Defendant's unlawful and unfair practices, Plaintiffs and class members have suffered injury in fact because they paid undisclosed and unauthorized fees on the 403(b) products that they purchased from Defendant.

155.   Because several of the Plaintiffs still have a 403(b) product with Defendant, and because of the ubiquity of Defendant's unlawful and unfair business practices, there is a real and immediate threat that Plaintiffs will suffer the same injury—being charged unauthorized fees—in the future.

156.   Plaintiffs and the Class are entitled to, and do seek, equitable restitution and the recovery of attorneys' fees and costs.

157.   Plaintiffs and the Class are also entitled to, and do seek, an injunction prohibiting

1  Defendant from continuing its unlawful and unfair conduct and for an order requiring Defendant to

2  make full disclosures on 403bcompare.com of the fees associated with its registered 403(b) products.

3  **PRAYER FOR RELIEF**

4  WHEREFORE, Plaintiffs, on behalf of themselves and the Class, seek the following relief:

5         a. Determining that this action may proceed as a class action under Fed. R. Civ. P.

6            23;

7         b. Designating Plaintiffs as the class representatives for the Class;

8         c. Designating Plaintiffs' Counsel as counsel for the Class;

9         d. Issuing proper notice to the Class at Defendant's expense;

10         e. Declaring that Defendant committed multiple violations of the UCL;

11         f. Granting appropriate restitution;

12         g. Granting appropriate injunctive relief;

13         h. For an order awarding attorneys' fees, expenses, and recoverable costs reasonably

14            incurred in connection with the commencement and prosecution of this action

15            including but not limited to attorneys' fees and expenses under the substantial

16            benefit and/or common fund doctrine or other similar principle or doctrine, or in

17            accordance with Cal. Code of Civ. Proc. § 1021.5; and

18         i. Granting other and further relief, in law or equity, as this Court may deem

19            appropriate and just.

20  **JURY DEMAND**

21  Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues triable

22  by a jury.

23  Dated: October 20, 2023          Respectfully submitted,

24                    /s/John G. Albanese

25                    John G. Albanese*
                     Ariana B. Kiener*

26                    **BERGER MONTAGUE PC**
                     *\*pro hac vice*

27                    *Attorneys for Plaintiffs*

28